Wasting beneficiary's money is imprudent. Congress enacted ERISA to impose a duty Judge Friendly famously said was the highest known to the law, a fiduciary duty. Under ERISA section 1104, a fiduciary managing assets in a retirement plan must act with prudence. ERISA fiduciaries must act with prudence, solely in the interest of beneficiaries, incur only reasonable expenses, and act with care, skill, and diligence. The Seventh Circuit erred by announcing a new rule that immunizes ERISA fiduciaries from suit for including imprudent options so long as some of the plan options are prudent. That holding is inconsistent with ERISA's plain text, common law principles, and this court's precedence. In Tybalt, for example, this court held that a fiduciary has an ongoing duty to monitor fund options and to remove imprudent ones. Prudence requires fiduciaries to treat plan assets with skill and care. Respondents maintained funds in the plan with retail fees, even though the exact same investment was available with lower institutional fees. Northwestern also failed even to put its record-keeping practices out for competitive bid or to use its enormous bargaining leverage to reduce fees. Long after universities like Caltech, Purdue, Pepperdine, and Loyola Marymount had reformed their plans, Northwestern finally negotiated for lower fees, made institutional share fees available, and consolidated its record-keeping. Respondents' own actions confirmed the plausibility of petitioners' complaint. Now, if I could just start with the plain text of the statute. And yet, that is the implication of the Seventh Circuit's rule and the position that the respondents advance here. In Tybalt, in ruling on the statute of limitations question, the court had to provide enough content for the ongoing duty to monitor imprudent funds and to remove them, and in doing so, drew upon common law principles of trust that required similar action to remove imprudent funds. So long as some options are prudent, say the respondents, the fiduciary cannot be sued for the imprudent ones. But that principle provides no check on a fiduciary, and it provides no check on inaction or a failure to act in the best interests of the participants. Nor is there a limiting approach or limiting principle to the respondents' approach. They say on page 25 of their brief that one rotten fund would be enough to give rise to a potential breach of fiduciary duty, but where do you draw the line after that? The respondents don't give any type of answer to that question, and there is none. In our position, we pleaded here plausible claims for a breach of fiduciary duty. In October of 2016, respondents' own actions confirmed the plausibility of the allegations that they had breached their fiduciary duties prior to that time. They finally consolidated their record keeper. They finally lowered fees. They finally made institutional share classes available. The complaint gives ample detail about all of these allegations compared to what the industry norms were at the time, and compared to other universities who had acted six years, in some instances before Northwestern finally got around to responding to the 2007 Department of Labor rule change, which was seeking to bring 403B plans into accordance and alignment with 401K plans. Now, what Northwestern failed to do as a matter of prudent process was that it failed to use its bargain leverage, notwithstanding the fact that its plans were in the top 0.2% in size of all plans in the country. But aren't you just disagreeing with the strategy? At some point, how much difference would there have to be before it doesn't matter? You could say there could be an egregious case in which they could have made a 20% return on investments, but you think that they make a 19% return. You disagree as to what the strategy should be. So you say there's no limit for them, but there's no stopping point for you either. Well, the stopping point for us, Justice Thomas, is objective reasonableness, which is a band. And that band is one that, in the industry, under the statutory words, the circumstances been prevailing, is going to recognize a wider band. But let me go back to the focus of what our complaint is, which is that the very same investment was being offered to participants at much higher cost than they should have been able to get because they were entitled to get the institutional share class fees. It would be like if I offered a bottle of water to you, Justice Thomas, and I said, would you like to pay $2 for it, or would you like to pay $1 for it? In this case, the Northwestern fiduciary was charging the beneficiaries $2, even though the $1 bottle of water was available. And that is imprudent, we assert, at the pleading stage, and we're entitled to the truth of our variants, that that pleads a cause of action for a breach of fiduciary duty. Now, your hypothetical goes to, obviously, a much more difficult question, and that's one that is not in the case directly as we have pleaded it so far, except in a couple of instances. But let me try to address it there. The band of reasonableness is usually going to be tied to some breakdown in process for prudence. Here, because Northwestern never bid out its record-keeping services, it didn't use its bargaining leverage to try to lower fees, it included proprietary funds that were bundled to the record-keeper. We allege that that led to a lower return, and that is a claim for procedural imprudence as well as a result of imprudence. And we think at this stage it is enough to meet the plausibility threshold of Iqbal and Twombly to survive a motion to dismiss. On that subject, on pages 101 to 116 of the appendix, you have a big table. Yes, sir. And the first column is all the things that were cheap, and the third column or fourth or third is all the things that were expensive. Same thing. You have a bunch of them. Okay, but what I can't find in the complaint, and I'm not sure whether it's there, you say that they offered the things in the first column, and they were much cheaper. Where do you say they did not offer the things in the third column? Well, they didn't offer them in the third column. That's the whole point of having the chart. That may be the point. All I want to know is where in the complaint it says they did not offer the things in the third column. We say on paragraphs, I think it's 161 and 64, that they offered retail class shares when the investment funds were available in the election. I know you say that. All I want to make sure is that you said, and they did not offer the other ones. I'm not familiar with that. Justice Breyer, let me try to answer the question in a very clear term. The fiduciary picks the fund. We're talking about a mid, let's just use an example, a mid-cap stock fund. The fiduciary picks whether to offer that to the participant at the retail class level, which is offered by the fund manager, or to ask that it be done on the institutional class level. Oh, wait, look at the words you put in there. Look at the words you put in. I'm sure I'm wrong, but the words you put in are driving my suspicion. Because what the fund could do, let's make it up on the fund. The fund invests in space shuttles. It's called the space shuttle fund. We have the retail version, and we have the wholesale version, or the institutional version. And they could do one. We're only going to let you buy the retail version. Or they could say, we're only going to let you buy the institutional version. Or they could say, buy either. We offer you both. They don't do that. That's what they don't do. And where does it say they don't do it? The way the industry works. I'm not asking how it works. I'm asking where in the complaint do you say what you just said, that they don't offer both. Pages 98 to 99, I believe we say that they were available. No, no, I read that with some care. What you say, and I have it right in front of me, is you first say, they can obtain share classes with far lower costs. Okay? Now, you don't say whether they did. But then if you read further, it says institutional share classes sometimes have a minimum investment threshold. You say that those... Yeah, yeah, yeah, yeah. But you don't say, then you say, mutual funds will often waive. So when I read those three sentences, I thought, what you're talking about is they wrongly failed to bargain. That's correct. All right. If that's your claim, I have a real question. It's not that I have one side or the other. But I have a real question I can't answer. And it seems to me that someone in your position or your clients, of course, a fiduciary shouldn't be able to go into the grocery store, to take an example, and pay $1,000 for an apple. Even if they're charging $1,000, he should say something. Okay? On the other hand, you can't expect a person to go into the giant grocery and get the best deal on each item. So how do you allege something? I mean, big deal to allege something. You know, they're going to have to have discovery. They're going to have to settle it. We all know all those problems. So what is it you should allege? I don't want to, I think, to say, hey, the fiduciary has to go out and just make the best bargain on every damn thing in front of them in that grocery store. On the other hand, you don't want to let him get away with doing nothing either. That's my real question. Justice Breyer, this exact same scenario was presented in Tybill, which, as you'll recall, concerned three funds that had institutional share available. Yeah, but we didn't answer this question in Tybill. But on remand, what happened in the course below was that the employees won the trial, that there were available these institutional share classes, and that was affirmed on appeal by the Ninth Circuit. The whole theory of the complaint is that these were available institutional share classes, and they were not being offered to the plan recipients. Well, the respondents say that there are thresholds that had to be met. And you have subsequently determined what the thresholds are for some of these funds, but you didn't allege them in your complaint. But you say that for purposes of pleading, you didn't need to do that. Is that right? I don't believe we needed to do that, because what we did, Justice Alito, we said that minimum thresholds are waived. We said that jumbo plans get the best deals. We pleaded, and this is at JA 98-100, that they're available if the respondents would have asked. On allegation at JA 100, we plead that other fiduciaries had obtained waivers from TIAA and Fidelity, which are the two that are issue in this case. So I think, Justice Alito, the question is plausibility. If the issue is how much more specificity is required, I think that's going far beyond Rule 8 of the Federal Rules of Civil Procedure, and what is plausible on the basis of what's required under Twombly and Iqbal. Mr. Patrick, are you saying that basically Northwestern just failed to use its existing leverage, failed to bargain? This was, you know, there was a bargain right in front of it, and it ignored it? Or, alternatively, there's some aspects of your complaint which suggest, look, they could have gotten the institutional rates if they had only scrapped half their plans, so that – scrapped half their funds, excuse me, so that the money would have been redistributed, and in each of those remaining funds, the threshold would have been met. Is that part of your complaint here, that they should have consolidated their funds in order to get the institutional rates? Or are you saying, no, forget the consolidation piece of this. Even with the number – their existing number of funds, they could have gotten the institutional rate, and they should have. We're saying both. They could have gotten the institutional rate. They were eligible for it. All they had to do was ask for it and get it, and they would have gotten it. The other universities that did the same kind of thing consolidated, that was the Caltech, Purdue, Pepperdine, Loyola Marymount example, which we set forth in the complaint about 20 pages before these institutional share class, and what was happening – isn't the consolidation claim a harder one for you? I totally get you saying like, my gosh, all they had to say was we want the institutional rate, and they would have gotten it. That just sounds like negligence and bad trustee management, whatever. But on the consolidation point, I mean, there is at some point a downside to having a non-diverse set of funds, right? Isn't that much harder for courts to figure out? Like, at what point is it like, no, nobody's going to want that plan. It only has three funds in it. That's why we also pleaded, Justice Kagan, that the industry norm, the circumstances then prevailing, to use the language of the statute, is there has been a reduction in consolidation in the industry ever since the Department of Labor issued its regulations in 2007, and that's why we plead that Caltech reduce the number of its offerings, and that the average among these types of plans is about 20 to 40, rather than the 242 in the retirement plan that were being offered by Northwestern. I would acknowledge that it is a harder claim to show that there's consolidation that would reduce fees, but there's a lot of expert testimony and expert analysis of that very situation, because in some instances they were offering 16 funds that offered the exact same investment mix, and the circumstances now suggest that consolidation will lower fees, it will provide an opportunity for less record-keeping expense, it will be better for the beneficiaries, and that is to be benefiting the plan. Mr. Frederick, along those lines, I can certainly see that argument, and I'm not talking about the first argument, I'm talking about the second argument now, but it does raise some questions about judicial competence and administration, and realms of reasonable judgment. What guidance would you have us give? Because I don't think you'd want courts to say 40 is a magic number, and that choice is bad. All things equal, choice is usually a good thing. So under what circumstances would you say that restrictions of choice, which would otherwise be a good thing, may not be? And what can we say about it that would be helpful? I think what you can say, Justice Gorsuch, is that the breach of fiduciary claim is an ancient claim. It is one that has always looked at objective reasonableness. Yes, yes, yes. The statute says to look at circumstances then prevailing, so you have to look at what's going on in the industry. You also are going to be guided to some extent by whether there are breakdowns in process that lead to such egregious results that you might infer that there had been a bad process. I think those kinds of things are going to help guide courts. But I would also just be frank with you to say a negligence cause of action is as old as the law is, and we're talking about in the breach of fiduciary duty space something akin to negligence, except that it is dealing with the objective reasonableness when someone is entrusted with the assets of another person. But the problem, I think, is you've referred to industry norm a few times, but that's changing, I think you've acknowledged. And, you know, you're trying to look retrospectively at one university. Did they change fast enough? Well, there are a bunch of other universities that did the same thing. There have been a lot of these suits, and a lot of them have now settled after it got past the motion to dismiss. But at what point in time? You've named three universities or maybe four that changed. Is that enough to say the industry norm has changed? Actually, the complaint alleges, and I think this is on page 100, that by the time the DOL rules took effect, which is a year and a half after they were promulgated, so January 1, 2009, some 57% of the 403B plans had conformed to bring their practices in line, and by 2013, depending on which survey we cited both of them in the complaint, between 80% and 90% of the plans, the 403B plans, had consolidated to a single record. So is it unreasonable then to not follow that DOL guidance and to provide, as Justice Gorsuch says, more choice? It wasn't a question of choice. It was a question of prudence and whether Northwestern had acted reasonably in essentially being asleep at the switch while everyone else was acting to conform their plans to practice. And to go to the suit point, Justice Kavanaugh, if I could just point out, these suits were principally brought, 18 of them of the 21 that had been brought in 2016, five years ago, and that was as it became completely evident that there were a handful of bad fiduciaries who had not complied with the DOL guidance. There have only been three suits that have been filed since 2016. Two of them were voluntarily dismissed after they were brought before the defendants answered, and the other one settled for a very small amount. So it's not as though the actual evidence of harm, what we're talking about here is a couple of bad outliers that were way behind industry standards in conforming their plans to the detriment of thousands and thousands of employees. Mr. Frederick, I have the same concern, I think, that Justice Breyer did. I'm wondering if you are, as you say, going after the bad apples, or the legal standard you're asking for is that we would be better and more aggressive managers of these plans and therefore everybody else is going to have breached their fiduciary duty. When you began, you quoted part of the ERISA standard, but you didn't go on and say, you know, the standards that a prudent man acting in a light capacity and familiar with such matters would use in the conduct of an enterprise of light character with light aims. And I'm just wondering, I mean, does that mean you go and look at the average, or do you come back and say, you know, like soliciting bids? I mean, you have to know for record keepers. You know, maybe people do it and sometimes it looks like a good idea and so they should, but I don't know that they should be held to the highest standard. I mean, is the fiduciary duty average, or is it the highest standard? Well, I think that the fiduciary duty, if you read the other words of the statute that I did quote, Mr. Chief Justice, because I don't run away from the ones that you did, for the sole and exclusive benefit of protecting the fiduciary, the participants. And in the same manner, it is a balancing act. Again, in a light capacity, familiar with all this. It seems to me that those are words that seem, I don't know if you want to say it's the average, or that it simply is, you know, the normal standards that would apply, as opposed to, you know, slightly below average, as opposed to egregious. I mean, it's the same concern that I think Justice Breyer had. If you said to somebody, you know, I want you to go out and fill this car with gas, you know, if you came to the intersection and one company A was however many, you know, dollars a gallon, and somebody else was a lot less, you'd expect them to go to the one that's a lot less. I don't know if you'd expect them to drive, you know, another 10 miles and go to the Acme Gas Company or whatever. It's a band of objective reasonableness, Mr. Chief Justice, and that's why offering things out for bid, requesting proposals, seeing what the market is offering, those are prudent practices by fiduciaries, and Northwestern didn't do any of that. Well, the people who wrote this complaint are very good, and they would have put in, that's my assumption, they would have put in to a fine degree everything that they could think of that would help them. And that's why I asked the first question. The closest that it comes to saying what you said is where it says on page 100 that I could find. I'll go look at it again, and I will really look through it. The closest, I couldn't find any language which said column 3, they didn't have them. Okay? But I bet they didn't. But why didn't you say it? Or I found on page 100, were available. Ah. You mean were available to them? Why didn't you say to them? Or just available in the market? And then I looked at page 99, and 99 makes the other argument. They should have bargained. All right. Now, if I'm really reading this with such a nitpicking view that I just did, which may come out of Twombly or Iqbal or, you know, I don't know where, but if that were the situation and you should read it like a real nitpicker, then I can find something lacking. And if I read it not like a nitpicker, it says what you said. So I'm slightly stuck, and that's where I'm at. And I don't even know. I know the apple, it says $1,000 for an apple here and right over there. It says $1. I mean, my God, of course. But if it's like a huge department store and time is limited and so forth, well, you can't expect them to do everything. So that's where I'm stuck. Well, let me try to unstick you in this way. The second to last sentence on page JE100 says, the following table sets forth each higher cost mutual fund share class that was included in the plans during the proposed class period for which a significantly lower cost but otherwise identical share class of the same mutual fund was available. I think that unsticks you, but I would secondly point out that we're at the point where you're supposed to draw the plausible inferences in favor of the plaintiff, and I would third point out the whole idea of moving to rules and this kind of notice pleading was that everybody was on notice from the district court on that this was the claim that we were asserting, that was how they argued it in the district court. But what they did was they asked the district court and the court of appeals to adopt this anomalous rule that doesn't exist anywhere else, which is that if you have some prudent options, that inoculates you as a matter of law from a claim that you have imprudent options. That's what we're asking you to do. Thank you, counsel. Justice Thomas, anything further? Justice Alito? I understand your argument about institutional and retail and about consolidating record keeping and management, but to the extent your claim is that the fund, that the offering, the list of offerings was bloated and included some, let's say it includes, let's say a portfolio includes some options that are popular and well, they're well known, they're popular, but they have high fees. What is the court supposed to do with a claim like that? I think you're supposed to say that we plausibly allege a breach of fiduciary duty. Now you go back to try to prove that. But what is the standard for determining whether the offerings, the list of offerings are bloated and whether it's a breach of fiduciary duty to include in it something that a lot of investors want, that a lot of investors like. It's a popular fund, but an expert might say this is unwise because the fees are too high and it has nothing to do with modern portfolio theory. I think that if we get to the merits, which is I think where your question is going, Justice Aliyah, if I may, and we're not at the merits now, we're just at the pleading stage, but if we get to the merits, the standard is going to be whether in light of the prevailing then circumstances, did the fiduciary here breach the fiduciary duty by not acting reasonably with respect to expenses and consolidating those funds where there was duplication. We offer a lot of allegations of lots of duplication where there is not a benefit to the beneficiary other than confusing that person by having too many options that are basically all the same. And it's like looking for the needle in the haystack. Justice Sotomayor. Mr. Frederick, I think that your strongest argument is with respect to the institutional shares because you're right. We have to read that plausibly. And you say others have offered institutional shares without the minimum and they could have done this. You have to prove it, but assuming that's plausible. The second, which I have a problem with, is your record-keeping fees because I think that your obligation there would be that you have to allege what that market rate is on the open market. And I don't see where you do that. I mean, I don't see you say it's $35, but you don't give examples of where people have negotiated to that price, that that somehow is the market rate. They did renegotiate and they got it down to $42. So you're halfway there. Okay? But I don't know how in a complaint how you could plausibly allege a price unless you allege why that's the market rate. So, Justice Sotomayor, the price is a proxy for the imprudence in the result of a failed process. We allege at pages 73 to 77 of the joint appendix that four other universities consolidated their record-keepers and thereby lowered their record-keeping fees. That's so hard because consolidating, there is so much going on with one or two record-keepers. I don't know how you ever could allege that having one as opposed to two is imprudent because I'm assuming that there is value to having two because you don't want to get rid of TIAA because of its institutional situation. So if I reject that argument that having one or two is the classic fiduciary right, don't you, or choice, how do you get to your second stage that having two would still have gotten you a lower price? Where do you allege that in your complaint? We allege that one of the universities that now escapes me went from seven to two to one record-keeper. We allege that 90% of the 403B plans by 2013 had moved to one record-keeper. They had done that to reduce the fees. We allege that there were more fees being paid by four to five times than was- How do you get to your basic premise that choices between one and two are imprudent because I just don't see how you could allege enough to destroy prudence because there are still people with two. There are still people with-and two doesn't seem outrageous to me. How do you get to what your market price is? Well, they never had a process to determine whether or not even those two were offering market rates. The process has to lead to losses. Correct. What's the loss? How have you alleged the loss? We allege the loss that they were paying four to five million dollars a year when a reasonable fee would have been approximately a million. That's at JA96. For two. Correct. So, how do you get to your basic premise that even having two might be prudent? Have they ever gone to Fidelity and TIA and said, we are one of the very largest plans, we want you to reduce your fees? They finally did that in 2016, and they got a rebate. We allege that other universities in 2008 and 2009 and 2010 had done the same thing to get fee rebates on their record-keeping expenses. It is plausible to suppose that a plan that was even bigger than those university plans also could get a rebate for record-keeping expenses that were unnecessary. Did they negotiate for a reduction in fee? You talk about 2016. Did they reduce the rate as well? They did. And that was part of our allegation, that it was seven years after all these other universities had done the same thing and gotten savings of millions of dollars a year for their retirees. Justice Kagan? Just to clarify that, am I right in saying that your complaint says that their record-keeping fees were too high even if you put aside the issue of consolidation? In other words, even if you say, we are not saying that they had to have one, or that they had to have two, or that they had to have any number. It's just they were too high. The complaint says that. Yes. And it also says, am I right, that they should have consolidated and that was one way, but only one way to reduce the record-keeping fees. Am I right? That's correct. Okay, thank you. In a way, that makes it very similar, very parallel to the investment fees, right? Because the consolidation thing, it's one way but only one way of solving a problem that you think exists even regardless of consolidation. Am I right? That's correct. And that's why I would point to the process where all these other universities were putting these out for competitive bid. Northwestern was not doing that. Northwestern was relying on its favored record-keeper that had an economic incentive to keep it tied in and it didn't try to get the best rate that even those record-keepers were providing. Right. I mean, one kind of allegation is, fine, you want to use TIAA and Fidelity, that's fine, but go back to TIAA and Fidelity and say, I don't know if you're giving us the best rate here. We're going to ask you to do better. That's correct. Okay, thank you. Justice Gorsuch? So I understand the institutional share point. I understand, I think, the cost point. I'm still stuck on the duplicative investment point. As a first, I guess my most basic question is, you allege that plaintiffs are confused by having too many options. Do you allege that your clients are actually confused? I didn't see, and maybe I missed it, and it's a long complaint. Justice Breyer's right. It's got a lot of paragraphs. Well done. Is there an allegation that these plaintiffs are confused? And is that something that we should take cognizance of or care about, given that choice would, other things equal, normally be a good thing? I think that you can plausibly read the complaint to say that our client, the immediate three that are before you, were confused by having all of the options, although the words are not directly put in the description of the participants. Let's say, reading quick ball, if I might, reasonably but not too parsimoniously, we find that there isn't sufficient allegations with respect to the three named plaintiffs. What would be the upshot of that? No change, because the statute provides a cause of action on behalf of the plan that participants or the secretary can bring an action on behalf of the plan. It is plausible here, Justice Gorsuch, because in 2016 the respondents consolidated from 242 plans to 32 mutual fund options. Again, we say their own actions plausibly confirm the correctness of our complaint. The question really is one of timing. Their defense will have to be we couldn't have done it before now. We're going to be arguing they could have done it much earlier, and that's where the battleground on facts will be done if you permit this complaint to go forward. If we do that, I mean, that's, again, the dilemma. Look, to me it's a dilemma. Maybe it isn't to anybody else, but these funds, I mean, they're enormously complicated. They have hundreds of sub funds and so forth. So it's the easiest thing in the world if they have a lot of choices. You say you had too many choices. And if they have only a few choices, you say you had too few choices. And so whatever they do, you're going to say this was wrong, and then what we'll be launching into is that you know the arguments and so forth. Okay, so what do we do? You don't want them to behave imprudently. At the same time, you don't want a group of plaintiffs to be able to say whatever they do, we're going to call it imprudently, and there we go. Nobody wants that. So what is it that we say that prevents those two evils, which are opposite? Well, I think, number one, you rely on facts, and you rely on the development of facts in the ordinary process. When you're at the pleading stage, you read the complaint plausibly to assume it's true. You said that before Twombly and Iqbal. Well, after Twombly and Iqbal, I think that the two standards, and Iqbal is is there a context in which to view. We give you the context in spades by talking about all the other universities, and we have lots of industry experts who are quoted in the complaint. We meet the Twombly standard because there wasn't an obvious alternative where they failed even to ask as a matter of process to get lower fees. Justice Kavanaugh? To pick up on Justice Kagan's points about the parallelism, I think the retort to your position would be both claims really depend on some consolidation, because I think they say in the first, on count five, that absent consolidation, you haven't sufficiently alleged that it was available, that you haven't met the minimum, there haven't been sufficient allegations that the minimum investment requirements were met or that you could get a waiver or that they could get a waiver. And so I think absent the consolidation, they're saying there's not enough there to show they could have achieved this, which makes it all depend on consolidation. So, too, on the recordkeeping, I think it's if you want to keep TIAA and you look at their amicus brief, you would have to drop fidelity, I guess. And so I just want to get your reaction to that. Maybe that's not the right way to look at it. Well, paragraph 159, Justice Kavanaugh, does not talk about consolidation, but it does talk about negotiating other fiduciaries who negotiated with Fidelity and TIAA-CREF to get the institutional class shares. That is a plausible allegation in light of all of the other detail in the complaint. So I don't think that one rests solely on consolidation. The recordkeeping allegations about the other universities, and this is at pages 73 to 82, roughly, of the joint appendix, go into the detail of what those other universities did as a matter of process, and I think that they plausibly suggest that Northwestern could have done the same thing and thereby reduced their recordkeeping expenses. Thank you. Thank you, counsel. Mr. Houston? Mr. Chief Justice, and may it please the Court, the text of ERISA requires the administrators of a defined contribution plan to act with, quote, care, skill, prudence, and diligence when they perform their fiduciary duty to select the investment funds and recordkeepers for the plan. Mr. Frederick has ably explained why the allegations in this complaint, assuming them to be true at this stage, show that respondents here acted imprudently by wasting plan participants' retirement savings. I'd like to focus this morning on the rule of law adopted by the Seventh Circuit and advocated by respondents. They assert that ERISA fiduciaries cannot be sued for offering imprudent funds with excessive fees so long as the fiduciaries offered some prudent funds with reasonable fees. That rule is wrong for at least four reasons. It flouts ERISA's text. It has no support in the common law of trusts from which ERISA's text derived. It is inconsistent with this Court's precedents, especially Tibble and Dudenhofer, and it would effectively immunize fiduciaries for broad swaths of imprudent management just because the fiduciaries performed their jobs adequately in at least a few instances. For all of those reasons, the judgment of the Court of Appeals should be reversed. I'd like to just begin with the statutory text. As was discussed in the last argument, the statutory standard requires careful, skillful, prudent, diligent management. These are the benchmarks that Congress incorporated, drawing on trust law, the wide body of trust law, in order to determine what constitutes prudent management. And when, as here, the complaint alleges that trustees have the opportunity to obtain a better rate, a lower cost, the restatement of trusts, and all of the major trust law treatises on which this Court has previously relied in its ERISA jurisprudence, make clear that trustees have an obligation to make careful cost comparisons among alternatives that are being selected for the plan. If a trustee or administrator followed that advice to the detriment of its returns or performance, would that administrator then be considered imprudent? Well, Justice Thomas, a claim of imprudence does not focus principally on the returns. It's not sufficient to state a claim. So then why should it focus principally on the expenses? Well, it focuses on process, but expenses are an important part of prudent management, Your Honor. Absolutely, the restatement makes that clear. All of the trust treatises say that. And that's because the amount of expenses that you pay as a member of a plan can pretty significantly affect the ultimate balance at retirement in light of compounding. So absolutely it's true that fiduciaries, prudent fiduciaries, have an obligation to pay careful attention to costs. Mr. Houston, is that the only factor? I mean, let's say the mutual fund plans, they advertise a lot on television. And it doesn't say just we have the lowest cost. You know, they've got different characters and, you know, trying. I mean, what if people in the fund say, you know, I really like, whatever, the gecko's nut funds, right? That's just insurance. Let's say I like that guy or I like the guy for E.F. Hunton who used to be a, I want to invest in those funds. I mean, is that, are you supposed to say no, you can't? No, Your Honor. I think that the situation that you are hypothesizing is one where fiduciaries are comparing apples and oranges. They're trying to decide should we invest in the Vanguard small cap index fund or the Fidelity bond fund. That is not anything like the allegations that we're talking about here. The allegations in this complaint are that the funds are identical. The only difference between the share class is the cost. That's one of the sets of allegations. One thing Mr. Frederick emphasized that I'd like to get the government's view on it is that one reason you know these people were bad is because they fixed something. In other words, their own actions show that they were doing something wrong. Is that a factor that we should consider or is the incentive, would we be creating an incentive not to fix things if we said you're in trouble because you fixed them? Well, Your Honor, I think the fiduciaries have a fiduciary duty to fix things if they have an opportunity to do so. The fact that the complaint alleges, as Your Honor notes, that these fiduciaries went out in 2016 and took some of the very steps that petitioners allege they were required to take. And specifically, they consolidated the plan lineup in order to gain access to institutional class shares. And as Mr. Frederick said, they obtained rebates from their existing record keepers and lower costs. The fact that they did it, I would say at the pleading stage, supports the plausibility of petitioners' allegation that they could have done it sooner. It's not dispositive by any means, but it's one piece of evidence that the trier of fact will need to consider in response to the defense asserted by my friend, Mr. Garr, that these opportunities really weren't available to the president. I assume what I'm about to say is false. It is not true that the Seventh Circuit said if you offer a small retail space shuttle fund, that's good enough if you also offer a large space shuttle fund. They said if you don't offer that large space shuttle institutional fund, that's okay because you also offered the large institutional farm fertilizer fund. Is that what they said, the latter? In other words, you offered some other fund, large institutional fund, that had nothing to do with what we're talking about, which is they should have offered the identical. So it's the latter they said, right? The Seventh Circuit said that because the fiduciaries had the opportunity, I'm sorry, the participants had the opportunity to invest in some other low-cost funds. But not other in the same type. Exactly. Then the argument would have to be, which you'll say is a defense, look, if we're going to offer X, we've got to do something because we only have a certain amount of money about all the other things we offer. And it was a judgment for us to decide how to do that or something like that. But that's a defense. Is that the point? It is the point. And I would just add one thing, Your Honor. When the fiduciaries made the decision that particular kinds of mutual funds were good options to offer to their plan participants, they said, we've looked, we think fidelity, small cap, mid-value fund is the one that we want, that's one that we want to offer to our participants in the plan. The obligation on the fiduciaries was to offer that specific investment at the lowest price that they could get it. And the core allegation in this complaint is that the fiduciaries failed to do that. And if they prove that allegation, there's simply no prudent explanation. So the way that you say it, Mr. Houston, the complaint really is they didn't negotiate hard enough, they didn't put things out for competitive bids, they were paying too much for the only thing that anybody wanted. But there's another set of allegations in this complaint which are more along the lines of they offered too many funds and they had too many record keepers. And if they had only consolidated whether the funds or the record keepers, they could have gotten lower prices. And as for me, that's the one that seems a little bit more, I don't know, I have to think about that. So what do you think about that? Your Honor, let me just start with the offering the duplicative funds. I think if you look at, for example, JA-102 and JA-106, you will see that before the plan consolidated their lineup, they offered funds that are very, very similar to each other. So just to take one concrete example, life cycle funds, right? These are funds that are offered to participants based on the target date of their retirement and they automatically balance themselves. And so you pick a fund like if you want to retire in 2050, you pick the 2050 life cycle fund. The plans offer both the Fidelity 2050 fund and the TIIA 2050 retirement fund. A participant is only going to pick one or the other in the normal course. Those are very, very similar. Do you think that that's possibly because the people who are participants in these plans, people roam around among different universities and they actually, some people, like I'm used to dealing with Fidelity. And other people are, I'm used to dealing with TIIA. And that there's a value to the plan in having variety for the sake of variety. If I might make just two points about that, Your Honor. The first is that I think that is a defense that the respondents are going to have the opportunity to present at trial. They're going to be able to say, look, there's a sensible explanation for everything we did. We picked two funds that seem duplicative because actually the people in our funds really like having access to both. We're at the pleading stage and the inferences have to be drawn in the respondents' favor. And then the other thing I would say in response to that is that might be a defense, but it might not be a defense if the difference between consolidating from two life cycle 2050 funds down to one life cycle 2050 funds is you can massively reduce the fees by getting access to the institutional class. Mr. Houston, the government seemed to take a position as brief as I recall, correct me if I'm wrong, please, on what I'll call the retail and institutional question and on the record keeping question. But it didn't take a position on the duplicative fund question. Your answers to Justice Kagan seem to suggest a position, but I'm just curious what's going on there. Sure, Your Honor. You're correct that we have not taken a position on the allegation, the theory of liability in the amended complaint that there were too many funds in the plan and that that led to participant confusion. All I'm saying is that when the question is, we certainly have taken a position, as Your Honor notes, that it was imprudent to offer retail class shares. I've got that. I think a factual allegation that's in the complaint that supports the plausibility of that claim. Forget about that claim. I'm not interested in that claim for the moment. I'm just focused on the purely duplicative choices claim. Do you think that there is a sufficient basis that these plaintiffs were confused to support injury for purposes of Article 3? Your Honor, we haven't taken a position on that claim. The claim about that there were too many funds and that it caused confusion, the government has not taken a position. Do you think we should be cautious about that claim, given that choice, for the reasons Justice Kagan and you explored a moment ago, is often a consumer good? Choice can be a good, Your Honor. It's not a good in and of itself. I think it always depends, as this Court said in Dudenhofer, on the facts and circumstances. In order to answer the question thoughtfully, I think I need to know both what is the value of the choice that's being pursued, why is more choice better, and what is the cost of the choice? If the cost of the choice is, we're talking about 20%, 40%, 80%, 100% increase in the cost of the fees, all of a sudden maybe it's not prudent. Thank you. I think that just gets back to the need to look carefully at the allegations in this complaint, and to recall, we're of course at the pleading stage, where all of the inferences have to be taken in respondents' favor. How often do these cases get beyond the pleading stage? Well, there are a number of courts, Your Honor, that gave rise to the circuit split in this case, that denied motions to dismiss similar types of claims and allowed them to proceed. The claim in Tibble- And that's settled, though. I mean, isn't the concern in the amicus briefs, and I don't know how to deal with this, is that these class action complaints are such that the game is to get past pleading stage. We've heard from Mr. Frederick and you the phrase pleading stage multiple times. This is just the pleading stage, don't worry about it, it can all be worked out, trial. It doesn't happen in the real world. What do we do about that? Respectfully, Justice Kavanaugh, I don't think that's quite right, that it doesn't happen in the real world. It doesn't happen often because there's huge pressure to settle, which has happened in many of these university 403B cases over the last few years. And I'm not saying which way that cuts, but I'm just saying just the pleading stage thing, which we've heard over and over again, kind of forces us not to deal with the reality of what's going on. Justice Kavanaugh, there have been cases that have settled, there have been cases like Tibble and Sacerdote against New York University that went to trial. I think the important point for purposes of this court is that the court was confronted with almost exactly the same argument in Dudenhofer. The fiduciaries in Dudenhofer came in and said, unless you really tighten up the pleading standard, it's going to be way too easy to bring imprudence lawsuits, it's going to be too expensive to do this kind of management, and plans are going to stop offering 401Ks. The court confronted that allegation and said, no, we are not going to adopt any special rule or assumptions favoring the prudence or the fiduciaries. Instead, we're going to look carefully at the allegations in the complaint. Some of the amicus briefs also say that being a fiduciary now is really a difficult task for the person individually. They'll have individual problems in the wake of doing that and that the fiduciary insurance market is problematic now. I think your answer is going to be, that's not really before us, but should we think about that at all, or where does that play out in all this? Is that up for Congress to think about? Of course it's always up for Congress, Your Honor, but I don't think the court can amend or should amend the Twombly and Iqbal framework for analyzing the plausibility of an allegation in the complaint based on concerns about that there's too many of these lawsuits. Again, I think that's exactly what the court was asked to do in Dudenhofer and declined to do. I also think the story in the real world is more complicated than Respondent and some of its amici suggest. Certainly, fiduciaries are indemnified, they get insurance, and they get advice from the Department of Labor and others about how a reasonable fiduciary acts.  Thank you, counsel. Thank you, Mr. Chief Justice, and may it please the court. This case is one of a barrage of damages actions filed against leading universities across the country, in petitioner's own words, to revolutionize fiduciary practices. Not through prospective changes to ERISA or its regulations, but through the blunt threat of damages actions for past conduct. For three overriding reasons, this court should affirm the judgment of both courts below that the amended complaint at issue fails to state a claim under ERISA. First, petitioner's claims are based on a flawed conception of the duty of prudence, which overlooks the role that Congress left for participant choice in this context, and would strip fiduciaries of the leeway they have always had to consider tradeoffs in addition to cost, such as the impact that minimum investment requirements for institutional class shares would have on providing investment options generally. Second, even if this court adopts petitioner's paternalistic conception of the duty of prudence, the amended complaint in this case still fails to state a claim under this court's pleading precedence. In particular, the complaint fails to allege facts from which there could be a reasonable inference that the alternative fees and services that they claim should have been provided were actually available to the plans. In the absence of those allegations, the complaint can't possibly cross the plausibility threshold established by Iqbal and Twombly. And third, allowing the cookie-cutter claims in this case to proceed not only would subject retirement plans to endless damages litigation, but would thrust the federal courts into the role of micromanaging those plans. And ultimately, it's the employees and the retirees who would be the real losers as plans shed options, scale back services, and perhaps even fold up altogether in the wake of skyrocketing insurance premiums. I welcome the court's questions. And if I could, maybe I would begin with Justice Kagan's. Mr. Agar, I'm sorry to distract you. You don't seem to spend much time on the Seventh Circuit's focus on the large menu defense. Could you comment on that a bit? Well, Your Honor, we think that ERISA itself encourages plans to provide a diverse menu of investment options. And we think that the notion that there's some kind of administrable line of whether a plan is too diverse or not diverse enough is essentially a Goldilocks rule that the courts could never administer. I mean, there's been a lot of discussion here this morning about the too many options aspect of their claim. And, you know, with respect to my friend, that was the premise of their claim on institutional versus retail class shares. And you can see that in count five of the complaint on page 170 of the Joint Appendix, which specifically says that the number of options deprive the plans of the ability to qualify for low-cost investments. And that's true in this respect. The more options you have, the more difficult it's going to be to qualify for minimum investment requirements. And that was the premise of their claim in count five. And they've shifted, Your Honor, to the claim that they subsequently tried to make in count seven of their Second Amendment complaint, which was not allowed and is not before this court. And I think that that infects their argument before the court today. But going back to the too many option claims, I think it is a problem in their position. And importantly, it's not one that the United States supported in their brief, this notion that there could be too many options, because it simply is an unadministrable line. Well, the United States didn't support it as an independent claim. But as I understand the United States' argument, they're perfectly fine with considering that in addressing whether there were too, you know, I mean, with respect, I'm not really sure what that means. I mean, they're not supporting that as a standalone argument. But yet they're somehow suggesting that that, you know, brings down the case. I mean, I think the theory was based on there being too many options. Options are a good thing. Employees want options. As you yourself rightfully said, employees come to universities. They bring options. We have economics professors who are asking for obscure options. That's a good thing. And the question is whether the plans adequately notify participants so that they can choose among those options, including with respect to cost. Suppose there were a complaint. Let's just talk about recordkeeping, for example. Suppose there were a complaint that said the fees that they were paying were much higher than comparative plans have paid. And this was because they never went back to their recordkeepers and used their bargaining power and really, you know, stomped on the table and got lower prices, and they never put out the recordkeeping function for bids, and they never did a bunch of things that can lead to lower recordkeeping fees. That's sufficient, isn't it? I think that's much closer, and I don't know the exact complaint. I mean, theoretically it would be, but there's two problems with the complaint here. On recordkeepers, the only way that they get to that number is shedding either the TIA, which offers popular annuities, and incurring a sanction. Well, I guess what I'm suggesting in my complaint, it's sort of independent of whether you have one or two. It's just that they didn't go back to those two and say, how are you doing on fees there? Can you come up with a lower price? Because you're giving lower prices to some of our competitors. Well, I mean, first of all, the notion that you can plead yourself into federal court a million dollars of cost of discovery just by saying you should have asked for a one-of-a-kind deal or a waiver from those requirements, the requirements exist for a reason, Your Honor. But why can't you go into federal court saying all your competitors are paying far lower fees than you are for the exact same service? Sure, and that gets closer to stating a claim, Your Honor, because in that instance you would actually provide a benchmark, you'd provide examples. They didn't provide those in this case. You didn't do the standard things that you should do in order to decrease your fees. You didn't put it out for competitive bidding. You didn't go back and say we're demanding lower fees. You didn't do any of those. You just let it just accumulate over the course of years such that you were paying far more fees than you would have had to if you had been paying attention. Right, and I think that complaint hasn't been stated here, Your Honor. First, you'd have to look at whether or not that's truly an available alternative. I mean, they fluctuated between they're talking about one record keeper or multiple record keepers. In this case, the only way to get to one record keeper is to shed popular investment options or incur a serious surrender charge. With respect, their claim is that we should have charged a $35 per participant fee. That number is plucked out of thin air. I mean, I would encourage you to read Judge Collier's decision in the Georgetown case, which says that there are no facts supporting that claim, $35, which is the same number they plucked out of the air. In that case, there's no other university that they point to. The closest that they point to is the one example, the Caltech example. Caltech itself had to shed many popular mutual funds by fidelity. There's no requirement that a plan is to drastically overhaul it, incur surrender charges, in order to satisfy options. I see that, if that's all right. I'd like to go back to the first one, which I asked about, and he gave some pretty good answers. We look at page 101 to 116, and I count 129 instances where you had investment fund X, small, and right next to it, institutional fund X prime, big, and you save money. What do they say about that table? They say that table sets forth each higher cost mutual fund share class that was included in the plans during the proposed class period, for which a significantly lower cost but otherwise identical share class of the same mutual fund was available. And I think it's fair to read that word available, meaning available to their defendant. Why doesn't that allege? It says, and then the page before, I mean, they have the sentence before, exact same mutual fund. That's the allegation, exact same mutual fund. And then we go to the page before that, and they have two more generalized instances where other similar defendants did bargain. Okay. Well, how doesn't that state a claim? Your Honor, they don't provide any factual content to support a reasonable inference that those funds were actually available. They don't identify the minimum. Wait, wait, wait, wait, wait, wait. You have to say it's called, let's call it Calvert News Vision Small Cap 1 CVSMX, and then they give the cost and then they give the access, all right, and they do that 129 times. And then they say it was available. I mean, you know, that's like saying, hey, you just said that Granny Smith apples are too expensive, but you didn't say they were available. I mean, really, at some point when you're in the business of selling share funds and they're saying was available, that's good enough, isn't it? It's not, Your Honor. Why not? If I could explain. I mean, take the example that petitioners have focused on, the Vanguard Small Cap Fund. We cite this at page 37 of our brief. That had an investment minimum of $100 million. And if you look at the plan documents, one of the plans had $800,000 in that fund. That would be a defense, wouldn't it? No. It wasn't available. With respect, the question is whether or not the conduct is equally consistent with lawful behavior. And if the minimum requirements haven't been met, then a plan that has both institutional class shares and retail class shares is perfectly consistent with lawful conduct. And there's no basis to infer just by the virtue of retail class shares that they have somehow acted imprudently. It's just as equally plausible that we simply hadn't met the minimum requirements for those shares, Your Honor. And if I could dispel the notion that these two types of shares are identical, the retail class shares and the institutional class shares. They're not in two respects. One, the institutional class shares carry minimum investment requirements. In order to meet those requirements, as I think has been acknowledged already, you'd have to aggregate funds and lose investment options. And that's a real cost in the plans. And two, the reason why institutional class shares are marginally more expensive is because a portion of those funds go to defraying administrative expenses for the plan as a whole, which is a particular benefit to smaller account holders who otherwise would have to pay higher fees. That's an additional cost. And those are both reasons why a prudent fiduciary would have a plan that allowed a mix of retail and institutional class shares, particularly if we hadn't met the minimum investment requirements for institutional class shares, and that there's no basis to include from the presence of that plan and the allegations in the complaint that the plan here was somehow plausibly imprudent. Counsel, I think you're still defending the Seventh Circuit's rule, which is you can't have an imprudent selection. You can't make it because if this is imprudent, there's another different kind of institutional share that's not. Is that your position as well? As well, that's an alternative position. Now, let's get to this allegation. Sure. $800,000 seems very close to a million to me, and I know that when people are, as an individual, when I'm close to a minimum, the first thing I ask is, won't you waive the minimum for me? And what they claim is that for institutions as large as this one, Northwestern, that if they had asked for the waiver, they would have gotten it, and they show how many other people had asked for waivers and gotten them. Why isn't that a plausible enough allegation to put you into proving a trial? Sure. I mean, first, it was $100 million, not a million, Justice Sotomayor, in the example on page 37. That's one, but I'm still, the point is still. But with respect to the allegations, and it's on pages 99 to 100 of the complaint, and this is the crux of their complaint, forget about the minimum requirements, you should have just asked for a waiver. They point to the fact that so-called large jumbo 401K plans have gotten waivers, but 401K plans differ from 403B plans in significant respects. Number one, the 403B plans have a lot of investment annuities, which are individual contracts that limit the liquidity of the plan, and number two, 403B plans, for historical reasons, have always had more options, which again... Well, that sounds like a possible defense, but how could it possibly be that a judge could throw out a pleading because you say 401K plans are different from 403B plans? I mean, that's to be decided, isn't it? Your Honor, there's still the question of whether these allegations are sufficient or non-speculative. And if you look at 99 to 100, they're purely speculative. Speculative? To list 129? I mean, you gave an example of where, to get to one of these big funds, you have to have $100 billion. All right, that leaves 128 others. And what they allege is that it was available. All right, there are 129 kinds of apples. One of them has worms, all right? But there are 128 others. Do you have to say more? Why? What? What do you say? To Iqbal and Twombly, what this court said is you have to allege the factual content sufficient to support a reasonable inference. If you don't identify the minimum requirements, if you don't attempt to explain how those requirements are met through allegations, then you haven't raised a plausible inference. It's simply not plausible to say that this institutional fund was available when we don't know if it had a $100 million investment requirement, $50 million, $200 million. We don't know at all because they didn't allege it. And again, if everything was going so well and you were doing everything right, why did you change? Because, Your Honor, two reasons. One, the regulatory changes in 2009, which came into effect, and that did require plans in the 403B and university space to begin managing plans differently. And that was a rule change. And the other is, frankly, the interim effect of damages litigation. But I think, as Your Honor indicated and Justice Kavanaugh indicated, there's no basis to hold the plan somehow accountable for the fact that it changed the way it operates in this new regulatory environment. And that kind of rule would prevent plans from taking prudent steps going forward and taking into account rule changes. I don't think that that can be the rule that would be a basis for harmful damages litigation. And I think you have to look at the flip side of this. If this kind of claim is okay, funds were available, you should have asked for a lower fee, then any claim is okay. And then once you get past the pleading stage for expensive discovery, the threat of settlement demands, I mean, if you look at what it's doing to the insurance premium market, premiums have skyrocketed and the market is in serious state. And we've cited articles just as recently as the fall on that. These would have disastrous consequences for plans. This Court has never thought of the duty of prudence in this kind of micromanaging assets. I mean, these sorts of claims are really relatively new in the last five to ten years. But once the Court goes down the path of saying it's sufficient for any plan participant to identify a single investment, and that's the United States and the petitioner's rule, and claim that you could have gotten that investment cheaper or you could have asked for a waiver or one-of-a-kind deal, and that that's sufficient in a class action to get to discovery and the threat of damages, I mean, that would be terrible for the retirement plans and for the participants in those plans. And that has never been the law. It's a fine balance, I agree with you. It's a fine balance between litigation and not. But some of this litigation has ended up being to the benefit of the retirees because the universities were not doing basic steps like just asking for price reductions, like just asking for waivers, and when they did, they got them. And so I don't know, counsel, that we can say a rule as broad as the Seventh Circuit has without harming the beneficiaries. We may not have a rule as wide as the petitioner wants, but there has to be a happier medium than what you're advocating and what the Seventh Circuit has. To be clear, I mean, I think that on the pleading standards, this Court could make clear that this claim is not sufficient, but in a claim that comes forth... It's hard to do it on this one, at least with respect to the investment institution. And maybe with respect to price, I have to go back to the complaint more carefully, but at least my law clerk did and told me that there was no allegation, and so you might be right, that keeping two fiduciaries would have reduced the price and to what level. But they themselves plead at page 78 of the Joint Appendix that use of multiple record keepers was common. But, Your Honor, on this complaint... I agree with you. I agree with you. What I'm saying is I don't know if they gave an allegation that's staying with that model, which I think is likely reasonable. This complaint, Your Honor, as the District Court recognized here, is massive in size but short on specific as to Northwestern and the plans at issue, and that's because it was drafted as part of an omnibus effort to go after 20 universities at once, which itself is inconsistent with the notion that they were somehow acting in an aberrant way that would have breached fiduciary duty. But the problem with this complaint, Your Honor, is it doesn't plead facts which would allow a reasonable inference that the alternative fees and services they claim should have been provided were even available to the plan. And under this Court's decision in Fifth Third, in the basic application of Twombly and Iqbal, that is not sufficient to state a plausible claim. And if it's enough to get around that just by having a standalone allegation, you should have asked for a waiver, then that's going to drive a hole through Iqbal and Twombly that's going to infect not just the rest of jurisprudence but civil jurisprudence generally. This Court has always said, and it said in Iqbal and Twombly again, that speculative allegations are sufficient. You've got to have the factual content from which you can make a reasonable inference. Here you have a plan that has institutional class shares and retail class shares. If you looked at the plan, the most reasonable inference is that the plan was prudently exercising choice based on whether minimum requirements were met and in light of the fact that retail class shares would help defray administrative expenses of the plan, which is exactly, by the way, what ERISA says. It looks to the administrative expenses of the plan. We certainly agree that cost is one consideration, but it has to be taken into account along with other tradeoffs. And that's what's missing from their theory. I mean, Judge Wood said in the Hecker case there is no rule that we always scrutinize and scour the market for the cheapest available option. If that's the rule that the Court adopts, which is effectively what it would be doing if it allows this claim to go forward, then the federal courts really are going to have to take over the management of these plans, selection of assets, fine-tuning services, deciding whether or not something at a given point in time should ask for a waiver or whether negotiation was sufficient. I mean, there's really no end to the way in which federal courts would be dragged into overseeing this and managing investment plans, which the Court has never done. I mean, the Court in the Jones v. Harris Associates case under the Investment Company Act took a much more prudent approach when it said that if we're going to get into this question of cost differences, they are going to have to show that the cost difference was so disproportionately large that one couldn't get to that. One couldn't look at that and say it was a result of an arm's-length negotiation. And so if you're going to factor in cost here, I think that exact standard would apply. The standard in that case came from Congress's reference to fiduciary, which the government in that case argued was the basis to import the common law of trust. My friend right here argued that case for the plaintiff in that case. He prevailed, but he recognized that really what you were talking about is whether there was a fair or reasonable fee. But in that context, the question of whether a fee was fair or reasonable was whether or not it was so disproportionately large that you couldn't say it was an arm's-length fee. The same standard would make sense to apply in this context, but it wouldn't allow a petitioner to a plaintiff to proceed in this kind of case, either with respect to the institutional share claim or the record-keeping claim, where you're talking about marginal differences in cost, where you fail to plead facts which would show that the alternative fee or service was even available to the plan, and when you couldn't say that a prudent fiduciary in the same circumstances could not have concluded that pursuing that fee or service, even if available, would do more harm than good, which is the other thing that— Look, he says that say you have $50 million invested in the expensive one in the chart, and they said you could take that $50 million and buy—and their word of their complaint is identical, identical fund at the lower price. Now, that's what they allege. And perhaps because you say, no, you need $100 million, you need a big amount, well, then they're not identical, okay? But they say identical. And so what are we supposed to do about that? Well, Your Honor, I mean, first of all, you have to look at the complaint. I'm sure my friend is going to get up to you here and tell you— It's the pages that you mentioned, which are the pages that do claim this allegation, which is about 98 through 116. All right, so what else do you want me to look at? They do contain the word identical, and that's also italicized. I would look at it, and you will find not a mention of the minimum requirements for each of those shares nor any attempt to establish plea facts that would show that they were met. I would look at the fact that this claim, which is count five, is premised on the argument that the number of options deprive them of the ability to qualify for low-class shares, which explicitly recognizes that the minimum requirements weren't met, Your Honor. And that's in the complaint. It's paragraph 266, page 170. And I would look at the deficiency of other allegations. If you want to look at the record-keeping claim, Your Honor, they allege in their complaint at page 78 that the use of multiple record-keepers was common. I mean, the fact is that when you're dealing with organizations over time using their services, it's not particularly common just to call out of the blue and say, you know what, I want a really lower fee. And these were prudently managed services, and over time, over a reasonable period of time, they eventually did negotiate a lower fee. But you can't hold that against them. And I would say, too, that the specific references my friend is referring to on that come from the Second Amendment complaint, a complaint that the District Court and Seventh Circuit didn't allow and that they declined to petition for cert on to this Court. So I think it's inappropriate for him to rely on that. I mean, really the fact is that their claims in this case continue to evolve. They rely on discovery out of the record. They rely on the Second Amendment complaint. But the only complaint before this Court is the amended complaint. And that complaint is simply deficient. And if this Court allows that complaint to go forward, then it really has provided no limit whatsoever. Because if I hear you correctly, Justice Breyer, it's enough to say in the abstract a share is identical, a share is available, and that's it, you're off to the races with discovery and settlement demands and the like. And that really would pose, as the amicus briefs tell you in far better detail than I could, an intolerable burden on the plans that would be to the detriment of plan participants. Ultimately, the cost of litigation, the cost of insurance and premiums themselves are going to be factored into the mix of administrative expenses that participants have to pay. And ultimately, as you limit options and scale back services, as a ruling by this Court in favor of petitioners would require plans to do, you're harming participants as well. Mr. Garrett, as I understand what the Seventh Circuit ruled in this case, the Seventh Circuit ruled that fiduciaries can avoid liability for offering imprudent investments with unreasonably high fees if they also offer prudent investments with reasonable fees. That's the essence of the Seventh Circuit's judgment. Are you defending that or not? I would disagree with that characterization. What I would defend, though, is... Okay, if the Seventh Circuit said that, would you agree with it or not? I wouldn't, because I think the question is whether when a plan offers generally sound, diversified investments and adequately informs employees about the aspects of those investments, including cost, is it a breach of the fiduciary duty? And I would say no. And I would point you to the Department of Labor's own materials and look at the... I think I'm losing track of your answer to my question. I basically said, are you defending a position that says you can insulate yourself from a suit that says you're acting imprudently, you the fiduciary, by saying, no, some of the investments that we offer in our plan are prudent and they have reasonable fees, and so you can't attack us for having unreasonable investments with unreasonable fees. Right. And one of the amicus briefs uses the example of a contaminated oyster. If the question was, you've got a contaminated oyster, but you've got good oysters, too, so that was prudent, I wouldn't defend that. But if you've got an oyster from the Chesapeake and an oyster from one of my favorite places, Apalachicola, and one is slightly more expensive than the other, then I would defend that. I would say Congress left to the participants the choice there. And the Department of Labor would agree with you. Well, sure, and all you're saying, you take an index fund and a managed fund. A managed fund is going to have higher fees than an index fund, and it's not unreasonable for a fiduciary to have both. Right. Right. But suppose the fiduciary had five index funds and one of them had low fees and the others were all gouging people. Would it be reasonable for the fiduciary to retain the others? No, it's never reasonable to provide funds that gouge. Here, if you looked at the retail class shares and the institutional class shares in isolation, there would be no argument that they were unreasonable in any respect, with respect to cost or anything else. The argument is that the shares are identical, and so, therefore, it was imprudent to offer both. As I mentioned before, they were not identical, Your Honor. The institutional class shares carry investment minimums that impact the number of options, and so that's an added cost. The retail class shares also help to defray administrative expenses for the plan as a whole, in particular, lower account holders. That's another cost. So they weren't identical. But on your hypothetical, Your Honor, you could never gouge. But the institutional class shares, the retail class shares, nothing about gouging. They wouldn't even argue that... I feel like you're putting too much weight on the word that I used. You know, it's easy to say, well, no, you can never gouge. The point is that you're not insulated from making bad decisions in your plan by the fact that you've made some good decisions in your plan, are you? No, but you'd have to look at it... Because if I think that that's what the Seventh Circuit said, that's got to be wrong, right? Well, with the caveats I've just given, I mean, I don't... I'm acknowledging that there's certainly... Choice is not always a defense. I think you'd have to take into account that, you know, what Congress said in 1104C, where the claim is it comes from the exercise of participants' control. I mean, that's what Congress said, and that really does answer your hypothetical. But this case is far easier than your hypothetical, Your Honor. And if you want to write an opinion that holds out the hypothetical, whether you call it gouging or something else, then that's fine. But that's not this case, because we're talking about marginal price differences, and they no longer argue that we didn't notify... They're not arguing that we didn't notify them adequately to make those choices. But I think that the hypotheticals make it a little bit too simple. Suppose the choice is between brand-name sodium chloride or non-brand-name sodium chloride. There are people who want the brand-name sodium chloride. Would it be imprudent to offer that choice? No, and, you know, there are some people who just don't want to change either, Your Honor. I mean, not everyone, if you put a Walmart right next to the Giant, not everybody is going to go shopping at the Walmart just because, you know, the cereal might be a penny or two less expensive. There are some people who don't want change, and change involves cost in itself. But I think you're right, Your Honor. I mean, that is quite different, allowing participant choice in that context. And, again, I would point you to the Look at 401K fees document by the Department of Labor, where they specifically tell participants, you know, there are expenses associated with different fund options. You should read your statements carefully, and you should look at those expenses in deciding whether or not to invest. Let employers know your preference. They said that on page 8, specifically with respect to the retail versus institutional class shares. Under a petitioner's view, it's not a question of letting employers know your preference. It's a question of one plaintiff coming in, bringing a class action, seeking to hold the entire plan hostage to massive damages claim. As long as they pick one asset, and they can claim that that asset was available at some marginally less expensive cost. There's no limit to the price difference. I think that came up earlier. There's no limit to the price difference under their theory that I've seen. And that is an extremely dangerous state of affairs for ERISA plans. And, frankly, I don't think it would put the courts in a role that they're well-suited to, managing and micromanaging investment decisions, fee decisions, services decisions. Your Honors, the claims here, if the claims here can proceed, then any plaintiff can subject the plan to threat of massive damages, millions of dollars discoveries, just by alleging that a cheaper fee, asset, or service was available, even if they provide no facts that would support an inference that that fee or service was actually available to the plans. And that would drive a hole through the pleading standards that this Court has established in Iqbal and Twombly. It would thrust the courts into a role that they are not well-suited to in micromanaging plans, and it ultimately would harm retirees and employees as plans struggle with the heightened costs, administrative burdens, litigation, as premium insurance skyrockets. We would urge this Court to avoid all that and affirm the judgment of the Seventh Circuit below. MR. GOTTLIEB. Mr. Justice Breyer, anything further? Mrs. Kagan? Thank you, Counsel. Rebuttal, Mr. Frederick? MR. FREDERICK. My friend doesn't defend the Seventh Circuit, and he nowhere talked about the statute, which is what we are here to be explicating. On that basis, I would urge you to, at the very least, send the case back. What you got was an extended motion to dismiss argument, which is what happens in the district courts. And I apologize to you all for the way this case had to come to you based on the Seventh Circuit's error, but the case must be reversed. I'll start with a question, Mr. Chief Justice, yours, with respect to the damages. Had Northwestern acted in 2009 and 2010 when many, many other universities, the majority of universities, it would have saved the plan millions and millions of dollars that rightfully belongs to the retirees. Justice Alito, we're talking about brand-name sodium chloride and whether you charge $1 or $2 for the same bottle of sodium chloride. Justice Sotomayor, if you look at page J80, there are multiple record-keeping, and we specifically allege there that there were inefficiencies with marketing and that there could have been a reduction in the costs that were given. Justice Gorsuch, in answer to your question about standing, confusion is not a cause of action. We allege financial harm. Confusion, though, is one of the process problems that is associated with the kinds of financial harm that we're talking about, and we asserted on behalf of everyone in the plan they were paying unnecessary record-keeping fees, they were not having access to institutional share classes, and that because of the failure to consolidate, their investment opportunities were fewer. Justice Kavanaugh, the fees have decreased so much that there are almost no new cases being filed in this area. That is an indication that the litigation that initially started this, coupled with the Department of Labor regulations, have actually redressed the problem of breaches of fiduciary duty that were identified early by the Labor Department during the Bush administration. So I would urge you not to take seriously this idea about insurance premiums and all these other things, because the reality is that the number of people who are taking advantage of defined contribution plans has gone up from 75 million to 109 million. The number of plans has increased from 630,000 to almost 700,000 in the period since we filed this complaint. So you cannot say as an empirical matter that litigation is somehow causing a problem. The whole point of the Department of Labor's regulations was to bring reform to this area. Some universities acted prudently and did so quickly, and they saved their retirees lots and lots of money. Northwestern did not. This case should be remanded so that we have an opportunity to prove at trial just how much they caused harm to our participants. Thank you. Thank you, counsel. The case is submitted.